Case 2:22-cv-04252-GRB-LGD   Document 8   Filed 07/28/22   Page 1 of 14 PageID #: 78

FILED
CLERK

3:11 pm, Jul 28, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

VINCENT RICHARD LEDDY,

                Plaintiff,

    -against-

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human Services, *et
ano*,

                Defendants.

------------------------------------------------------------X

**MEMORANDUM AND ORDER**

22-CV-4252 (GRB)(LGD)

**GARY R. BROWN, United States District Judge**:

    Before the Court is a truly exceptional case. The plaintiff, Vincent Richard Leddy, a bilingual medical doctor who diligently works in an underserved, low-income community, seeks a temporary restraining order staying a directive by the Department of Health and Human Services (HHS) excluding him from participation in all federal health programs. Docket Entry ("DE") 2. This administrative order, issued without a hearing, sounds the death knell for his medical practice, a critical resource for 5,000 patients, many of whom are vulnerable, impoverished and otherwise without access to health care.

    The proposed exclusion is based upon Dr. Leddy's conviction of a criminal offense stemming from a potential Medicare audit. Sadly, that a medical doctor was prosecuted in federal court does *not* make this case exceptional. In a society riddled with illegal prescription drug addiction and health care fraud, the prosecution of medical doctors has become a shockingly common, if not routine, event in federal court, sometimes involving medical providers inflicting harm upon the very patients they have sworn to heal. Rather, what makes this case extraordinary are the aberrational circumstances surrounding the prosecution, the highly attenuated nature of the underlying conduct, the otherwise exemplary professional life of the plaintiff and, most notably,

1

the virtually[1] unprecedented, detailed determinations by an experienced trial judge at the sentencing hearing in that criminal case urging relevant authorities not to exclude Dr. Leddy from continued participation in health care programs.

In her findings, Judge Azrack expressly found that suspending the plaintiff from the Medicare program would not only represent a substantial injustice but would constitute an unwarranted harm to the underserved community to which he attends. Notwithstanding these findings, HHS proceeded to commence exclusion proceedings based on a misreading of the applicable law. Judge Azrack's findings, along with the other evidence submitted, and HHS's misguided interpretation of statutory provisions, require that the instant application be carefully weighed, and on balance, the Court finds that the issuance of a temporary restraining order is warranted.

## BACKGROUND

The plaintiff, Dr. Leddy, operates a medical practice in Brentwood, New York, which he describes, under oath, as follows:

> I am a physician duly licensed to practice medicine in the State of New York. I have practiced for decades in Brentwood, New York. I am bilingual which is essential for effective communication in the Spanish speaking community. I have treated multiple generations of patients and am a trusted and valued provider of medical services in the community. The area in which I practice is recognized as being underserved, meaning that there too many patients in the area for the limited number of physicians to treat.

DE 2-1 at ¶ 2. Yet we need not rely on Dr. Leddy's description alone. New York State Senator Phil Boyle, the legislator for the relevant community, makes the following observations:

> Dr. Leddy has practiced in Brentwood for more than thirty years. Based on my knowledge of his practice, Dr. Leddy treats countless individuals, many of whom reside in underserved communities. He is very well regarded in the Brentwood

---

[1] Over the course of several decades, the undersigned has been involved – both as a judge and a prosecutor – in thousands of federal criminal prosecutions, and yet is aware of only one comparable case, which did not even happen in this century. *See United States v. Dr. Joseph Charles*, 97-CR-877 (EDNY 1999) (Mishler, J.).

> community, not only because of his medical expertise, but also because of his willingness to go above and beyond the minimal requirements of a medical professional.  For example, I would like to note that during the COVID-19 Pandemic, when many healthcare facilities were shut down, Dr. Leddy's clinic remained open to the community.  This, of course, incurs a risk for the health and safety of him and his staff.  Dr. Leddy and his staff were willing to put themselves at risk of contracting the virus in order to care for people in some of the hardest-hit areas.

DE 2-4.  Indeed, even his sentencing judge reached similar conclusions:

> As I have learned through reading all of the submissions in this case, including the over 220 letters, Dr. Leddy is an extraordinary person and an extraordinary doctor who has served an underserved community in Long Island for years.
>
> I was particularly moved by a letter from Steven Schwartz, who has known Dr. Leddy for over 20 years.  Mr. Schwartz describes Dr. Leddy as a man who has dedicated himself not only to his medical practice, but to a community where the help he provides is priceless.  Mr. Schwartz stated, quote, in this world, we need more Dr. Leddys, not less.
>
> I also note that Dr. Leddy provides physicals to incoming firefighters, he provides medical care to the sisters at St. Joseph, and he treats all clergy on a gratis basis.  The letters from his patients are also compelling evidence of his devotion to a needy segment of the population.

DE 2-2 at 16.

*The Criminal Case*

In late 2014, the doctor made a terrible mistake in judgment and violated the law.  Having learned that a Medicare audit had been initiated relating to certain tests performed by his office, in his words,

> On retrieving the records and having them reviewed, I learned that the testing results were useless and did not reflect proper test results. I paid someone to produc[e] fictitious testing results that I mailed to Medicare from Brentwood, New York.

*See United States v. Leddy*, 15-CR-0004(JMA), DE 9 at 22.  Dr. Leddy acted promptly to accept responsibility for his actions, entering a guilty plea in January 2015 to a one-count information charging obstruction of a Medicare audit.  DE 2-1 at ¶ 4.  Judge Azrack observed that Dr. Leddy

3

"has never made excuses for his aberrational criminal conduct, and readily acknowledged his grave mistake." DE 2-2 at 17. Paradoxically, the feared audit never occurred. DE 2-2 at 15.

Beyond immediately accepting responsibility, in an effort to make amends for this transgression, Dr. Leddy performed services that directly and substantially benefitted the Medicare program. DE 2-2. For seven years, he assisted the agency with numerous investigations and, according to one investigator, "was one of the best cooperating witnesses with whom he ever worked." DE 2-2 at 15. At the direction of federal investigators and prosecutors, he worked on a dozen investigations, made recorded telephone calls and wore a wire to various meetings. *Id.* He was "proactive and frequently brought potential leads to the attention of government agents." *Id.* at 15-16. Dr. Leddy's efforts prompted a federal prosecutor to describe him as "a valuable resource for many health care investigations that we have been conducting." DE 2-2 at 14.

Based on this record, unsurprisingly, at his sentencing in December 2021, Judge Azrack imposed no incarceration, limiting his sentence to a statutorily-mandated special assessment of $100. DE 2-2 at 17.

*The Exclusion Notice*

By letter dated June 30, 2022, HHS advised Dr. Leddy that "[e]ffective 20 days from the date of this letter, the Office of Inspector General (OIG) of the Department of Health and Human Services is excluding you from participation in all Federal health care programs . . . for the minimum statutory period of 5 years." DE 7-2. The sole basis for this determination, the letter continues, was his "conviction . . . of a criminal offense related to the delivery of an item or service under Medicare or a State health care program." *Id.*, citing 42 U.S.C. 1320a-7(a)(l). Dr. Leddy filed an administrative appeal, which will not be heard for weeks, and, it is estimated, will not be decided for many months. DE 2 at ¶¶ 16-17.

4

The impact of the administrative exclusion order is ruinous. Dr. Leddy's practice would immediately lose approximately 80% of its revenues, while ensuant exclusions from Medicaid and commercial insurance carriers would inevitably follow. DE 2-1 at ¶ 8. Furthermore, pharmacies, labs and testing services would be unlikely to fill prescriptions or perform services for the practice's patients. *Id.* His counsel cannot be accused of hyperbole in predicting that, should the exclusion order take effect, "Plaintiff will have to close his practice." DE 2 at ¶ 19.

Such an outcome would prove difficult, if not catastrophic, for the patients served by Dr. Leddy's practice. As the plaintiff attests:

> I have more than five thousand patients in my practice whose care will be jeopardized if the exclusion is implemented or permitted to continue.
> . . . .
> I will not be the only one to suffer. My patients will suffer too. Their care and treatment will be disrupted, and they will have problems finding other physicians that can provide care. Their care will be compromised.

DE 2-1 at ¶¶ 2, 9. Again, this is not an uncorroborated, self-serving assessment. James O'Connor, President of the nearby St. Charles and St. Catherine Hospitals, writes:

> [A]ny diminution of [Dr. Leddy's] ability to care for his patients would be a tremendous loss for his many patients who already have extreme difficulty accessing high quality medical care. One only needs to spend a day in his office and you will see high quality compassionate care at its finest to an underserved group of patients within the Long Island Community.

DE 2-4 at 2. Perhaps most strikingly, Judge Azrack, intimately familiar with the facts and circumstances of the conviction that forms the exclusive basis of the exclusion order, made the following findings at the sentencing:

> [T]here is more, much more of his background that cries out for him to continue to practice medicine and serve his community. . . . Dr. Leddy is an extraordinary person and an extraordinary doctor who has served an underserved community in Long Island for years. . . . it is a rare situation where in a sentencing context, I come away so uplifted by a defendant's life and deeds and find that the best use of my authority is to sentence the defendant to go forth and continue to do the good he has done and made his life's work thus far. . . . I also urge the relevant authorities to

5

>> exercise their discretion to permit you to continue to practice medicine. . . . I hope they recognize the significance of the words of the president of St. Charles Hospital and St. Catherine's Hospital, who described what a huge deficit it would be if Dr. Leddy were not able to continue to serve the underserved and underinsured members of the Brentwood community.

DE 2-2 at 16-17. In other words, the judge who imposed sentence for the very conviction that is driving this administrative exclusion order strongly believes that such an outcome is not only unjust, but contrary to the public interest. Nevertheless, HHS moved forward with the exclusion, seemingly under the misimpression that exclusion was mandatory. DE 7 at 1.

*Filing of this Action*

On July 20, 2022, just as the exclusion was about to take effect, counsel for Dr. Leddy filed this action seeking temporary, preliminary and permanent injunctive relief. DE 2. His counsel immediately filed an application for a Temporary Restraining Order staying the effect of the exclusion order. *Id.* Recognizing the sensitivity of such matters, rather than simply grant the TRO, the Court directed the United States Attorney's Office to file a response by July 22 indicating "whether or not the government will consent to forbear enforcement of the exclusion order pending the resolution of the administrative proceedings." Electronic Order dated July 20, 2022. The Government complied, reflecting in its response that "it is HHS's position that the agency lacks the authority to forbear enforcement of the mandatory exclusion order." DE 7 at 1.

This opinion follows.

## DISCUSSION

*A. Standard Of Review*

The Court has "wide discretion in determining whether to grant a preliminary injunction," and such relief is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River*

*Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted).

A party seeking preliminary injunctive relief must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (citation omitted). Several district court opinions suggest that "[i]t is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *See, e.g.*, *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). While the notion that a district court should apply the same standards to a TRO as to a preliminary junction is generally true, the practicalities of such determinations often impose additional limitations: a TRO, effective for a much shorter period, must often be imposed more hurriedly, and with far less information, and Congress has recognized this distinction. *See generally* Fed. R. Civ. P. 65(b) (permitting the issuance of a TRO, under appropriate circumstances, "without written or oral notice to the adverse party"); *cf. Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) ("plaintiffs state that the standard for granting a temporary restraining order and a preliminary injunction are the same. While technically true, there are differences between these procedural devices.") In this matter, because of prior federal court proceedings, the Court has a wealth of information upon which to make this determination.

HHS argues that, where the preliminary injunction will affect governmental action "taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." DE 7 at 3

7

(citation omitted); *Doe v. United States Merch. Marine Acad.*, 307 F. Supp. 3d 121, 143 (E.D.N.Y. 2018) (citing *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007)). Of course, that formulation requires adoption of the heightened "likelihood-of-success" standard to the exclusion of the "fair ground for litigation" alternative when the governmental action is "taken in the public interest."[2] *Id.* at 142-43. That raises a fascinating question in the instant case in which court findings demonstrate that the subject governmental action is *contrary* to the public interest. However, because the plaintiff easily satisfies the "likelihood-of-success" standard, the Court need not reach this determination.

Furthermore, HHS insists that the injunction sought by plaintiff is a "mandatory injunction" altering the status quo, requiring Dr. Leddy to make a "'clear' or 'substantial showing of a likelihood of success on the merits.'" DE 7 at 3; *Doe*, 307 F. Supp. 3d at 143 (citing *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)). On the instant facts, this characterization of the relief sought appears unwarranted. Dr. Leddy has participated in federal health care programs for years, if not decades. The exclusion notice, which arguably had not become effective at the time of filing, has been in effect, at best, a few days. Thus, the TRO sought is not one that alters the status quo; rather the Court finds that it maintains the status quo. And the realities of the situation demonstrate that, absent court intervention at this juncture, the exclusion would likely irrevocably doom the medical practice before reasoned review could occur. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842 (2d Cir. 1962) ("The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has

---

[2] Some cases omit the "public interest" clause when stating this rule, yet said omissions are not intended to alter the framework. *See, e.g.*, *Ferreyra v. Decker*, 456 F. Supp. 3d 538, 545 (S.D.N.Y. 2020) (discussing "A TRO sought against government action taken pursuant to a statute or regulatory scheme . . .") (citing *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (setting forth complete standard)).

an opportunity to pass upon the merits of the demand for a preliminary injunction."). Such considerations render the issuance of a TRO appropriate.

### B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted). "[T]he alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). The irreparable harm must be actual and imminent, not remote or speculative, and must establish that such harm is likely in the absence of an injunction. *Id.*

The facts set forth above render this incontrovertible: if the exclusion order is not stayed, there will be harm: harm to the plaintiff and his practice, harm to his patients, harm to the community. And that harm will inexorably be irreparable.

### C. Likelihood of Success

*HHS's Erroneous Statutory Application*

Plaintiff alleges that the issuance of the exclusion notice without a hearing violates his rights under the Due Process clause of the United States Constitution.[3] The Court need not engage in extensive analysis of the myriad of procedural and constitutional complexities at issue because it appears that the agency's interpretation of the statute, and its belief that exclusion is mandatory, is plainly wrong.

In its response, Government counsel represents, without citation to authority or regulation, that "it is HHS's position that . . . the plain language of 42 U.S.C. § 1320a-7(a)(i), under the

---

[3] While plaintiff also challenges the subject actions under the Administrative Procedures Act, which may further support the relief sought, the Court has not considered these arguments in order to provide the parties a speedier response.

9

circumstances present here, makes the exclusion mandatory and the agency is unable to contravene the statue's mandate." DE 7 at 1; *cf. id.* at 2 ("Defendants Lack Authority to Forbear Enforcement of a Mandatory Statutory Exclusion [because] HHS determined that this crime fell within 42 U.S.C. § 1320a-7(a)(i)"), *and id.* at 2-3 ("pursuant to the mandatory language of the statute, HHS lacks the authority to forbear enforcement of the exclusion against Plaintiff.").

The agency's understanding of the law turns upon the interpretation of the following statutory language:

> The Secretary shall exclude the following individuals and entities from participation in any Federal health care program . . . [a]ny individual or entity that has been convicted of a criminal offense related to the delivery of an item or service under subchapter XVIII or under any State health care program.

42 U.S.C.A. § 1320a-7(a). While one might craft a reading of this statute which would apply here, it is, at best, attenuated. It may be the case that an offense committed to frustrate a Medicaid audit could be deemed "related to the delivery of an item or service" under the Act because, for example, successful completion of the audit would impact future services provided under the statutes. But this analysis fails, where, as here, *the subject audit was never conducted.*[4]

The purported applicability of the above statutory language is entirely undermined by another subsection of the statute providing that:

> The Secretary may exclude the following individuals and entities from participation in any Federal health care program . . . Any individual or entity that has been convicted, under Federal or State law, in connection with the interference with or obstruction of any investigation or audit related to the use of funds received, directly or indirectly, from any Federal health care program.

---

[4] From a policy perspective, depending on the circumstances, Government administrators might well want to exclude or limit the participation of a provider who attempted to tamper with an audit. As discussed herein, under 42 U.S.C. § 1320a-7(b)(2)(ii), the Secretary retains discretion to exclude or limit the participation of a provider convicted of such an offense under appropriate circumstances.

10

42 U.S.C.A. § 1320a-7(b)(2)(ii). This section, entitled "Permissive exclusion" expressly applies to a "[c]onviction relating to obstruction of an investigation or audit" and plainly governs the instant case. *Id.* As the sole count, "Obstruction of a Federal Audit" pursuant to 18 U.S.C. § 1516, *see* DE 2-1 at ¶ 4, which is similarly reflected in the judgment of conviction, the (b)(ii) provision controls, while the mandatory provision is inapplicable.

This conclusion derives from well-established principles of statutory interpretation. "[T]he ancient interpretive principle that the specific governs the general (*generalia specialibus non derogant*) applies … to conflict between laws of equivalent dignity." *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21 (2012). Hence, "when two statutes cover the same situation, the more specific statute takes precedence over the more general one." *Cook v. New York State Division of Parole*, 321 F.3d 274, 279 n.4 (2d Cir. 2003) (quoting *Coady v. Vaughn*, 251 F.3d 480, 484–85 (3d Cir. 2001)). Therefore, the permissive exclusion provision of § 1320a-7(b)(ii) indisputably governs here.

Thus, HHS has unnecessarily constrained its own authority, unjustifiably confining this determination into the mandatory statutory exclusion category. Even assuming that this were not the case, or if HHS should be inclined (for reasons that would border on the unimaginable) to exercise its discretion to proceed nevertheless, another issue may preclude Dr. Leddy's exclusion, which is addressed below.

*Restoration of Dr. Leddy's Rights and Relief from Civil Disability*

Though not raised by the parties, the issue of restoration of rights following a conviction must be considered. The express findings made at the sentencing proceeding indicate a clear basis for such consideration, as Judge Azrack found that the collateral consequence of exclusion from medical programs was unwarranted.

While many states have enacted procedures for the restoration of various civil rights following a conviction, the path remains far less clear for those convicted in federal court. *See Beecham v. United States*, 511 U.S. 368, 373 n.* (1994) ("We express no opinion on whether a federal felon cannot have his civil rights restored under federal law. This is a complicated question, one which involves the interpretation of the federal law relating to federal civil rights"). At the same time, Congress has provided authorization for the restoration of certain civil disabilities for federal felons under appropriate circumstances. *See, e.g.*, 18 U.S.C. § 925(c) (granting district courts discretion to restore firearms rights for felons upon the denial of a petition by the Attorney General). Furthermore, this Court retains substantial post-conviction authority concerning some of the effects of its judgments. *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release"). Other forms of relief may be available through a court's equitable power. *See, e.g.*, *United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir. 1977) (holding that district courts may expunge criminal arrest records in extreme cases); *United States v. Noonan*, 906 F.2d 952, 956-57 (3d Cir. 1990) (though an "extreme" remedy, "a federal court has the inherent power to expunge an arrest and conviction record.").

In *Doe v. United States*, 168 F. Supp. 3d 427, 444 (E.D.N.Y. 2016), Judge Gleeson determined that, even in absence of extreme circumstances, the district court is empowered to grant a Certificate of Rehabilitation to a defendant convicted in this Court. Drawing upon the authority of Federal Rule of Evidence 609(c), as well as the United States Sentencing Guidelines, Judge Gleeson ordered the issuance of such a certificate to assist a rehabilitated defendant avoid collateral consequences of her conviction, including difficulties obtaining housing and employment. *Id.* at

445. The issuance of such a certificate in this case may render the conviction inadmissible in ancillary judicial and administrative proceedings, rendering the exclusion proceedings moot. As such, should this matter continue, plaintiff's counsel may apply for such a certificate, either from the undersigned or Judge Azrack.

*D. The Public Interest*

Based on the substantial record here, including the findings of Judge Azrack, the question of the public interest is easily dispatched. As the involuntary closure of the subject medical practice would severely, if not irrevocably, harm thousands of patients receiving medical care, the public interest overwhelmingly favors issuance of a TRO. In this regard, the Secretary's reliance upon *Doyle v. Sec'y of Health & Hum. Servs.*, 848 F.2d 296 (1st Cir. 1988) is misplaced. DE 7 at 6-7. In that case, Justice Breyer weighed the risks of wrongly sanctioning a physician against that of "failing to warn patients against a doctor whose services are seriously deficient," and reached the obvious conclusion. *Doyle*, 848 F.2d at 302. Here, notwithstanding a well-developed factual record and the passage of seven years since the offending conduct, there is not even a hint of substandard health care being provided by the plaintiff. Indeed, all indicators suggest the opposite. Thus, the public interest weighs in favor of issuing a TRO.

## CONCLUSION

Based on the foregoing, the Court hereby issues a TRO enjoining and staying the effect of the notice of exclusion – as well as any related exclusions or actions – for a period of 14 days from the date of this Order. The Government has requested three weeks to fully respond (as well as authorization to file an oversized, 35-page brief), but said request must be denied without prejudice pending consent to extend the TRO for a period to allow full briefing and reasoned consideration of a preliminary injunction hearing. As such, the parties shall advise the Court in writing, on or

before August 5, as to whether the parties have stipulated to continue the TRO pending a preliminary injunction hearing, or whether some other resolution of the matter has been reached. Failing such agreement, the Court will hold a preliminary injunction hearing on Thursday, August 11, 2022 at 10:00 a.m.

                                              **SO ORDERED.**

                                        /s/ Gary R. Brown
                                        Gary R. Brown
                                        United States District Judge

Dated: Central Islip, New York
        July 28, 2022
Time: 11:00 a.m.